United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAYVON HARDIN,<br>Plaintiff,<br>v.<br>CITY OF RICHMOND, et al.,<br>Defendants. | Case No. 24-cv-09411-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 66 |

## I. INTRODUCTION

Plaintiff Trayvon Hardin brings this civil rights action under 42 U.S.C. § 1983 against the City of Richmond and four of its police officers arising out of a traffic stop on the afternoon of February 25, 2024. Then eighteen years old, Mr. Hardin was the front-seat passenger in a vehicle stopped for a supposed window tint violation. What began as an equipment stop escalated into a physical encounter.

For organizational purposes, the Court divides the physical encounter into two phases. According to Mr. Hardin, he was a passenger in a car stopped because of an infraction for tinted windows. The officer who initiated the stop responded to the driver's repeated demands for the officer to explain the reason for the stop, unsuccessfully asked Mr. Hardin for his identification, and took Mr. Hardin's cell phone from his hands. After Mr. Hardin refused to exit the vehicle upon command, two officers forcefully pulled Mr. Hardin out of the vehicle by his arms, took him to the ground, subdued him on the ground by applying a knee to his back, and handcuffed him. (Phase One). The two officers then located a semi-automatic firearm on Mr. Hardin's person. After Mr. Hardin was handcuffed and the firearm was removed, and as one officer walked him to the police vehicle, the officer executed a second takedown of Mr. Hardin to the ground (Phase Two).

United States District Court
Northern District of California

Mr. Hardin asserts claims for excessive force, unlawful arrest and detention, municipal liability under *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978), and, as to other officers present at the scene, failure to intervene.

Defendants move for summary judgment on all claims. For the reasons set forth below, the motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

On the record before the Court, including body-worn camera ("BWC") footage, and with the facts and all reasonable inferences drawn in Plaintiff's favor, a reasonable jury could find that the two phases of force asserted against Mr. Hardin were objectively unreasonable. Defendant Salala's and Defendant Charles' motion for summary judgment on the excessive force claim is therefore **DENIED** as to all uses of force.

Summary judgment as to qualified immunity is also **DENIED** as to Officers Salala and Charles as to both phases of force.

On the unlawful arrest and detention claim, the motion for summary judgment is **DENIED** as to Officer Salala's seizure of Mr. Hardin's phone, but otherwise **GRANTED** as to the alleged unlawful detention. Qualified immunity is **DENIED** as to Officer Salala's seizure of Mr. Hardin's phone.

Summary judgment as to unlawful arrest and detention is otherwise **GRANTED** in part as to Officer Salala, and **GRANTED** in full as to Officers Charles and Castillo.

On the failure to intervene claim, the motion for summary judgment is **GRANTED** as to Officers Castillo and Remick; and

On the *Monell* claim, the motion for summary judgment is **GRANTED** in favor of the City of Richmond.

## II. BACKGROUND

### A. Traffic Stop

In the afternoon of February 25, 2024, Officer Jose Salala of the Richmond Police Department ("RPD") was on patrol in the area of the city known as the "Iron Triangle." Salala Dep. (Fine Decl., Ex. 5) at 60:1–7. Officer Salala observed a gray Audi with tinted front windows, which he believed violated California Vehicle Code § 26708(a), and he activated his

United States District Court
Northern District of California

emergency lights to initiate a traffic stop. *Id.* at 24:14–29:25. Mr. Hardin's then-girlfriend, Taliah Addi, drove the vehicle, while then-eighteen-year-old Trayvon Hardin sat in the front seat as the sole passenger. FAC ¶¶ 25, 27; Hardin Dep. (Fine Decl., Ex. 7) at 5:5–23. Mr. Hardin does not dispute, for the purposes of this motion, that the stop was initiated based on the window tint (though Mr. Hardin points out that "[n]o tint citation was ever issued to any occupant."). Opp. (Dkt. 69) at 12.

According to Officer Salala, the vehicle did not immediately yield; it slowed and stopped in the roadway, during which time Mr. Hardin briefly opened and then closed the front passenger door.[1] Salala Dep. at 30:17–32:18. Officer Salala classified this as one of multiple "furtive movements" by Mr. Hardin "throughout the entirety of the traffic stop." *Id.* at 49:17-50:16. Officer Salala stated that he believed that Mr. Hardin's opening and closing of the car door indicated that Mr. Hardin sought to flee, reach for a weapon, or attempt to discard contraband. *Id.* at 31:8–32:18. Officer Salala also described that "through the back window" he observed Mr. Hardin making "furtive movements" inside the vehicle, which he considered indicative of an attempt to hide contraband, access or hide a weapon, or prepare to attack. *Id.* at 49:15–50:2. Officer Salala did not specify whether his observations through the back window occurred before or after the vehicle stopped moving. *See id.* Last, Officer Salala claims he saw Mr. Hardin "move around his hands" – conduct Officer Salala also considered a "furtive movement." *Id.* at 50:10-16.

Mr. Hardin offers a more innocuous explanation for his conduct preceding and during the stop: he states that he briefly opened and closed the passenger door only to stop it from chiming because it was ajar. Hardin Dep. at 5:24–8:8; Opp. at 10. The BWC footage of the encounter after the vehicle was stopped does not show that Mr. Hardin made any "furtive movements"; instead it shows that he sat calmly in place with his hands clearly visible. *See* Salala BWC (Fine Decl., Ex. 2); Charles BWC (Fine Decl., Ex. 3). Mr. Hardin testified that he was not moving in

---

[1] The RPD did not equip patrol vehicles with dashboard cameras at the time, so the pre-stop movements are not independently recorded. MSJ (Dkt. 66) at 4 n.1.

the vehicle while they were being pulled over. Hardin Dep. at 31:21–23. He also testified that after the officers pulled the vehicle over, he used his cell phone to call his sister. *Id.* at 35:17-24.

Officer Salala approached the passenger side of the vehicle to conduct the stop. Officer Salala conceded that Mr. Hardin made no threats, verbal or otherwise. Salala Dep. at 49:5–7. He also admitted that during the stop, Mr. Hardin's hands were visible and that Officer Salala is "not too concerned" when a person's hands are visible. *Id.* at 46:7–22. Officer Salala stated that when he stood by the passenger window after initiating the stop, Mr. Hardin "was not doing much." *Id.* at 53:13–54:9.

The BWC footage indicates that Mr. Hardin was not wearing a seatbelt. *See* Salala BWC at 3:24-35. Officer Salala, however, did not testify he attempted to cite Mr. Hardin for any seatbelt violation.

At the outset of the stop, Officer Salala initiated verbal contact with Taliah Addi and Mr. Hardin at 3:44:44 p.m. The BWC shows that Officer Salala initially engaged with the driver, Addi. Salala BWC at 0:54–1:02. From the moment Addi rolled down the car windows (first the back window, then the passenger side window), she questioned why Officer Salala had stopped the vehicle. Salala BWC at 0:54–1:02. Addi protested that it was daytime, went back and forth with Officer Salala regarding her driver's permit, and asked to speak to Salala's supervisor, maintaining that he had no reason to pull her over because her tint was not illegal. Salala BWC at 0:54–2:18. Initially, when Officer Salala asked Addi for her driver's license (which she ultimately did not provide despite stating that she was looking for it), Officer Salala also demanded Mr. Hardin's identification, even though Mr. Hardin was not the driver and there was no indication that he was responsible for the car and the tinted windows. Salala BWC at 1:07–25. Hardin declined to provide a form of identification. Salala BWC at 1:10–25.

During this initial encounter, Mr. Hardin for the most part sat silently and did not engage in conversation with Officer Salala, other than to decline to provide his identification. Salala BWC at 0:54–2:18; *see* Salala BWC at 1:58–2:00 (as Addi challenges Officer Salala's basis for the stop, Mr. Hardin quietly makes an unintelligible remark that seems to reference being "pulled over," but the conversation is primarily between Addi and Officer Salala). Most of the exchange

was between Addi and Officer Salala.

Two minutes into the exchange, after turning the conversation to Mr. Hardin, Officer Salala told Mr. Hardin to "stop calling people or I'm going to take your phone." Salala BWC at 2:05–07. Ten seconds later, Officer Salala reached into the vehicle through the passenger window and took Mr. Hardin's cell phone from his hand. *Id.* at 2:16-19.

The parties characterize this act in different terms. Officer Salala testified that he suspected Mr. Hardin was using his phone to summon others to the scene and that removing the phone was a reasonable safety measure. Salala Dep. at 35:7–19. Mr. Hardin testified that he was simply speaking with his sister on the phone and asserts that Officer Salala's seizure of the phone from his hand was unjustified. Opp. at 13.; Hardin Dep. at 35:2–36:18. Officer Jarred Charles arrived at the scene as backup during this time, followed by Officers Enrique Castillo and Nicholas Remick shortly thereafter.

At 3:47:22 p.m., two minutes and thirty-eight seconds into the stop, Officer Salala ordered Mr. Hardin to exit the vehicle. Salala BWC at 3:29–30. Mr. Hardin did not expressly refuse, but also did not make any movements indicating he would exit the vehicle. *Id.* at 3:29-30. Two seconds after the request, Officer Salala opened the car door. *Id.* at 3:31. Mr. Hardin did not comply with the request to exit, asking instead why he was being ordered out of a car in which he was a passenger. Hardin Dep. at 34:6–35:16. Officer Salala again asked Hardin to step out of the car. Salala BWC at 3:37. Mr. Hardin verbally refused to exit the vehicle, while Addi stated multiple times to Officer Salala that the officers' search was illegal. Salala BWC at 3:29–4:38. Exactly one minute after his second request for Mr. Hardin to exit the vehicle, Officer Salala took hold of Mr. Hardin's arm to remove him forcefully from the vehicle, and together, Officers Salala and Charles forced Mr. Hardin to the ground, placed him in a prone position, and handcuffed him. Salala BWC at 4:38–56; Charles BWC at 1:09–30. Mr. Hardin alleges that an officer then placed his knee and weight on his back while he was prone.

The parties' account of this sequence diverges sharply, and each side maintains that the footage supports its version. Although Defendants contend that Mr. Hardin actively and physically resisted by pulling his arm away as Officer Salala attempted to remove him from the

vehicle, there is evidence from which a reasonably jury could find that Mr. Hardin was largely passive. The BWC footage shows Officer Salala reaching into the cabin and taking ahold of Mr. Hardin's wrist, after which Mr. Hardin uses his left hand to help remove his right wrist from Officer Salala's grasp while asking, "what are you doing?" Salala BWC at 4:17–39. The video does not depict active or forceful resistance by Mr. Hardin such as using force against the officer or striking the officer. *Id.*

After Mr. Hardin was brought to the ground, the officers applied handcuffs. Salala BWC at 4:47–59; Charles BWC at 1:16–30. The body worn camera footage shows Mr. Hardin on the ground from 3:48:34 p.m. to 3:49:06 p.m., for approximately thirty seconds. Charles BWC at 1:14–48; Salala BWC at 4:43–5:16. An officer applied handcuffs at around 3:48:50 p.m., about fifteen seconds after Mr. Hardin was taken down to the ground by officers. *See* Salala BWC at 4:58. At 3:48:34 p.m., the footage briefly depicts Officer Salala kneeling on Mr. Hardin's backside, shifting his knees to Mr. Hardin's lower back, and holding Mr. Hardin's left arm behind his back. Charles BWC at 1:14–21; Salala BWC at 4:42–46. The footage suggests that pressure may have been applied but was not applied for the entire time Mr. Hardin was on the ground. Charles BWC at 1:35 (depicting neither officer placing pressure on Mr. Hardin at 3:48:54 p.m. as Officer Salala searches Mr. Hardin's backpack from a standing position). However, it is unclear from the officers' video footage angles how long exactly pressure was applied to Mr. Hardin's back, and how much pressure was applied at any given point.

Mr. Hardin has presented evidence that he remained face-down and handcuffed on the pavement for roughly 37 seconds and that an officer's body weight remained on his back after the cuffs were applied. Hardin Dep. at 50:3–51:10. Mr. Hardin does not specify precisely how the pressure was applied but testified that officers were "leaning" on his back. *Id.* at 50:8–19.

While Mr. Hardin was handcuffed and on the ground, the officers discovered a firearm concealed in Mr. Hardin's waistband: a loaded Glock handgun fitted with an extended magazine, convertible to automatic fire. Notably, the firearm was discovered *after* the officers had taken Mr. Hardin to the ground and handcuffed him; there is no contention that any officer saw a weapon or a suspicious shape while Mr. Hardin was seated in the vehicle. Reply at 5.

United States District Court
Northern District of California

After discovering the firearm, the officers lifted Mr. Hardin to his feet and began walking him toward a patrol vehicle. Salala Dep. at 72:14–77:2. As Officer Salala walked Mr. Hardin toward the patrol vehicle, Salala applied a second use of force. Defendants contend that Mr. Hardin "leaned forward, spun in a circle," and successfully broke free of Officer Salala's grasp, prompting Officer Salala to reasonably perceive that Mr. Hardin was attempting to flee and to push him to the ground in response. Reply at 9–10. Mr. Hardin, however, contends that he moved his arm only because his handcuffs were too tight, not because he was attempting to flee, and that as a cuffed, searched, and disarmed teenager surrounded by officers in the middle of a street, he posed no flight or safety risk justifying a second takedown. Opp. at 15–16; Hardin Dep. at 52:1–25. The BWC footage does not resolve this disputed fact. *See* Salala BWC at 5:17–22; Charles BWC at 1:49–53.

Mr. Hardin was arrested. MSJ at 16; FAC ¶ 50. He was transported to Kaiser Permanente Richmond Medical Center, where he was medically cleared before being taken to jail. Hardin Dep. at 54:24–55:10; FAC ¶¶ 45, 51. He was later charged in the Superior Court of Contra Costa County for violation of (1) California Penal Code (PC) § 32625 (a), possession of a machine gun, (2) PC § 25850(a), carrying an unregistered handgun, and (3) PC § 148(a)(1), resisting arrest. MSJ at 16, 76; FAC ¶ 50.

Mr. Hardin alleges that the traffic stop and ensuing encounter caused bruising and abrasions to his shoulder and an injury to his left bicep for which he underwent shoulder x-rays, was prescribed pain medication, and received a sling. FAC ¶¶ 45, 47. He also alleges ongoing emotional distress. *Id.* ¶ 48–49. Mr. Hardin alleges that the Contra Costa County District Attorney ultimately dismissed all charges against him, FAC ¶ 52, a fact that appears to be undisputed.

B. <u>Evidence Bearing on *Monell* Claim</u>

Mr. Hardin's municipal liability claim rests on three theories: ratification, custom, and failure to train. FAC ¶¶ 112–57.

The City investigated the February 25, 2024 incident and did not issue a finding of misconduct against either Officer Salala or Officer Charles. Opp. at 24. Separately, the City

United States District Court
Northern District of California

placed Officer Salala on administrative leave in March 2024 in connection with an unrelated matter and, months later, terminated him upon sustained findings of excessive force in another matter involving the use of a K9. Jagannath Decl., Ex. 23. The parties draw opposite inferences from this history. Mr. Hardin contends that a city that exonerated the conduct at issue here, while terminating the same officer for excessive force elsewhere, ratified the conduct in this case. Opp. at 24–25. Defendants contend that the termination demonstrates that the RPD disciplines misconduct when it is substantiated. Reply at 16.

Mr. Hardin identifies a set of prior RPD incidents and pre-suit civil actions that he offers as evidence of a systemic custom of tolerating excessive force during stops. These include internal affairs files reflecting exonerated uses of force during stops, as well as numerous civil actions filed against the City before February 25, 2024, alleging unlawful use of force during stops, detentions, and arrests. Jagannath Decl., Exs. 28–30. Defendants respond that these are unproven allegations offered without any contextual comparison, that the incidents are factually distinct, and that none are tied to the conduct of Officers Salala or Charles. Reply at 16–18.

C. Procedural Background

The Court previously dismissed two categories of claims with prejudice in this case. First, it dismissed the claims against Chief Bisa French in her official capacity as duplicative of the claims against the City. Second, it dismissed Mr. Hardin's state law claims because Mr. Hardin failed to timely present them, noting that he could seek to reinstate them only if he obtained a finding of excusable neglect from the Superior Court. Mr. Hardin never did so, and no state law claim was repleaded in the FAC. As a result, only federal claims remain in this action. Minute Entry (Dkt. 33).

Mr. Hardin filed the FAC naming the City and Officers Salala, Charles, Castillo, and Remick in their individual capacities.[2] It does not name Chief French, and it pleads no state law claims. *See* FAC. It asserts four claims under 42 U.S.C. § 1983: (1) excessive force against Officers Salala and Charles; (2) unlawful arrest and detention against Officers Salala, Charles,

[2] At this stage, "Plaintiff withdraws the individual-capacity claims against Officer Remick." Opp. at 17.

Castillo, and Remick; (3) *Monell* liability against the City of Richmond; and (4) failure to intervene against Officers Castillo and Remick. FAC ¶¶ 78–176. The excessive force count encompasses all applications of force described above: (a) the grabbing and removal of Mr. Hardin from the vehicle, (b) the takedown that forced him into a prone position on the ground; and (c) the second push after he was handcuffed.

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). "The mere existence of a scintilla of evidence … will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party's assertion of a fact as undisputed must be supported by materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. Fed. R. Civ. Pr. 56(c)(1)(A). Evidence may be presented in a form that is not admissible at trial so long as it could ultimately be capable of being put in admissible form. *See* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence"); *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004) ("Even the declarations that do contain hearsay are admissible for summary judgment purposes because they 'could be presented in an admissible form at trial'").

United States District Court
Northern District of California

## IV. DISCUSSION

A. Excessive Force (Officers Salala and Charles)

Mr. Hardin's excessive force claim arises from two applications of force. The first application of force includes Officer Salala's removal of Mr. Hardin from the vehicle, takedown by Officers Salala and Charles, and alleged kneeling on Plaintiff's back while he was being searched and handcuffed by both officers. The second application of force consists of Officer Salala's second takedown of Plaintiff while escorting him to the patrol vehicle. The Court evaluates each alleged use of force separately. *See, e.g.*, *Robinson v. City of San Jose*, 2021 WL 4222133, at *3 (N.D. Cal. Sep. 16, 2021) ("The Court will evaluate each alleged use of force separately."); *Manzo v. Cnty. of Santa Clara*, 2020 WL 6940935, at *6 (N.D. Cal. Nov. 25, 2020) (same); *Escalera v. City of San Pablo*, 2026 WL 220998, at *5 (N.D. Cal. July 30, 2026) ("Each application of force must be justified at the time it is used.").

A claim that officers used excessive force in the course of an arrest or investigatory stop is analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388, 395 (1989). The inquiry asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them," judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396–97. The analysis requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted).

To gauge the governmental interests, courts weigh the factors identified in *Graham*: (1) the severity of the offense at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting or attempting to evade arrest by flight. *Id.* "The most important *Graham* factor is whether the suspect posed an immediate threat to anyone's safety." *Williams v. City of Sparks*, 112 F.4th 635, 643 (9th Cir. 2024) (quoting *Nehad v. Browder*, 929 F.3d 1125, 1132 (9th Cir. 2019)); *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021).

Reasonableness of the force used turns on "the facts and circumstances of each particular

case" as they were known to the officer at the time. *Graham*, 490 U.S. at 396–97. Facts that an officer learns only after the fact can neither create nor cure the reasonableness of force already used. *Id.*

Furthermore, the quantum of force used must be proportional to the need for it. Officers are not required to use the least intrusive means available, but a takedown, like any other use of force, "must be justified by the need for the specific level of force employed," and the availability of less intrusive alternatives is a relevant consideration. *Rice*, 989 F.3d at 1121. Because the reasonableness of force scales in relation to the governmental interest, "when the governmental interest is insubstantial, the application of even minimal force may be unreasonable." *Nelson v. City of Davis*, 685 F.3d 867, 878 (9th Cir. 2012). Both "the nature and degree of physical contact" and "the risk of harm and the actual harm experienced" inform the Court's analysis. *Seidner v. de Vries*, 39 F.4th 591, 597 (9th Cir. 2022).

With respect to resistance, courts recognize that resistance "runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer," and courts must "evaluate the nature of any resistance in light of the actual facts of the case" rather than affix a conclusory label. *Bryan v. McPherson*, 630 F.3d 806, 830 (2010). Along that spectrum, the Ninth Circuit distinguishes between passive and active resistance: "a failure to fully or immediately comply with an officer's orders neither rises to the level of active resistance nor justifies the application of a non-trivial amount of force." *Nelson*, 685 F.3d at 881. A refusal to exit or re-enter a vehicle at an officer's command, in particular, has been held not to constitute active resistance. *Young v. Cnty. of L.A.*, 655 F.3d 1156, 1165–66 (9th Cir. 2011) (pepper spray and baton blows inflicted on a plaintiff stopped for a seatbelt violation was considered unreasonable and thus excessive when plaintiff only engaged in "passive noncompliance" with orders to re-enter his vehicle). Although passive resistance may in some instances justify *some* measured force to gain compliance, the level of force permitted depends on the surrounding circumstances. *See Nelson*, 685 F.3d at 881.

The Ninth Circuit has cautioned:

> "Resistance," should not be understood as a binary state, with

> resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer. We must eschew ultimately unhelpful blanket labels and evaluate the nature of any resistance in light of the actual facts of the case. For example, in *Smith v. City of Hemet,* we confronted an individual who "continually ignored" officer commands to remove his hands from his pockets and to not re-enter his home. In addition, he "physically resisted ... for only a brief time." 394 F.3d at 703. Although Smith was not perfectly passive in the encounter, we stated that it did not appear "that Smith's resistance was particularly bellicose" and thus found that this factor provided little support for a use of significant force. *Id.* Even purely passive resistance can support the use of some force, but the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance.

*Bryan*, 630 F.3d at 830.

Because inquiries into excessive force "nearly always require[] a jury to sift through disputed factual contentions, and to draw inferences therefrom," "summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). Where the parties have submitted video of the encounter, the court views the facts "in the light depicted by the videotape," but only to the extent the footage "blatantly contradict[s]" the non-moving party's account. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Where the recording is open to more than one reasonable interpretation, the ordinary rule governs and the evidence, including the video, is viewed in the light most favorable to the plaintiff. *See id.* But where there is passive resistance involving no threats or resistance to the officer, the use of "non-trivial force of any kind" is generally unreasonable. *Rice*, 989 F.3d at 1125–26 (quoting *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1093 (9th Cir. 2013)).

1. <u>Phase One: Removal from Vehicle, Takedown, and Handcuffing on Ground</u>

The force at issue in Phase One consists of the officers' grasping Mr. Hardin, forcibly removing him from the passenger seat of the vehicle, taking him to the ground face-down on the pavement, and applying body weight to restraint him while placing him in handcuffs.

Officers Salala and Charles both participated in the Phase One force, and the claim is asserted against both. For the reasons that follow, under the facts viewed in Mr. Hardin's favor, the officers applied excess force and are not entitled to qualified immunity. The Court **DENIES**

summary judgment as to this first use of force.

Defendants correctly observe that, during a lawful traffic stop, an officer may order a passenger out of the vehicle as a matter of course without an independent justification. *Penn. v. Mimms*, 434 U.S. 106, 111 (1977); *Maryland v. Wilson*, 519 U.S. 408, 410–15 (1997). That authority forecloses any claim that the order to exit was itself unlawful *per se*. But it does not resolve whether the degree and manner of force used to enforce that command were reasonable. The lawfulness of an order and the reasonableness of the force used to carry it out are analytically distinct inquiries, and the latter is governed by *Graham*.

The Court now turns to the circumstances relevant under *Graham*.

a. Severity of the Offense.

First, the Court examines the severity of the offense at issue during the traffic stop of Taliah Addi's vehicle. *Graham*, 490 U.S. at 395. The only offense under investigation was a window-tint infraction by the driver – not Mr. Hardin. Mr. Hardin was a passenger who, at most, after the stop, presented a seatbelt violation. The stop itself was not based on reports of violent or dangerous offenses such as a robbery, assault, reckless driving, or driving under the influence. The stop was based only on an allegedly unlawful windshield tint – a minor equipment violation that sits at the lowest end of the governmental interest scale. This factor weighs significantly against the application of non-trivial force. *See Young*, 655 F.3d at 1170 (minor misdemeanors weigh against the use of significant force); *Rice*, 989 F.3d at 1122–23.

b. Threat to Officer Safety

With respect to the second *Graham* factor – whether Mr. Hardin posed an immediate threat to the safety of others – a reasonable jury could find no reasonable basis for believing he posed such a threat. *Graham*, 490 U.S. at 395. Again, the stop was based on an allegedly unlawful window tint, a possible infraction attributable only to the driver. The officers were not responding to a reported crime, much less a crime involving a suspected firearm. *Cf. Handy v. Jones*, No. 25-5105, 2026 WL 2716416, at *6 (9th Cir. Sep. 15, 2026) (officers reasonably identified plaintiff as an immediate threat because plaintiff had reportedly assaulted his girlfriend while in possession of a shotgun, and was reportedly awaiting officers while still armed).

Moreover, Officer Salala testified that Mr. Hardin made no threats of any kind, Salala Dep. at 49:5-7, that Mr. Hardin's hands remained visible during the encounter and Officer Salala is "not too concerned" when a person's hands are visible, *id.* at 46:7–22, and that Mr. Hardin "was not doing much," *id.* at 53:24–54:9. Indeed, the BWC footage shows Officer Salala initially engaging with the driver, Taliah Addi. Salala BWC at 0:54–2:18. While Salala and Addi engaged in a heated verbal exchange lasting more than two minutes, Mr. Hardin remained generally quiet throughout most of that exchange. *Id*. The footage shows no furtive movements or any physical or verbal conduct by Mr. Hardin that could reasonably be perceived as a threat to Officer Salala.

Defendants rely on Mr. Hardin's opening and closing of the passenger door while the vehicle was moving and his allegedly "furtive movements" at the beginning of the traffic stop to suggest that the officers reasonably feared he was armed. MSJ at 11. Plaintiff concedes that he opened and closed the door while the vehicle was moving, but claims he did so only because the car had been beeping to alert him that the door was open. Hardin Dep. at 6:14–24.

Given the basis for the traffic stop (a mechanical infraction) and the lack of any other basis to suspect involvement or possession of a firearm (no call of a sighting or use of a firearm or of any crime that might involve a firearm), the mere momentary opening and shutting of the door while in plain sight of the pursing officer in broad daylight does not give rise to a reasonable suspicion that Mr. Hardin possessed a firearm. Defendants do not identify any case law supporting the contention that merely opening and closing a car door itself establishes reasonable suspicion that a suspect is armed. Nor did Mr. Hardin's behavior during the stop suggest as much: he was quiet and his hands were visible throughout the stop. Salala BWC at 1:40–4:37. And, viewing the evidence in Mr. Hardin's favor, Mr. Hardin made no furtive gesture indicating he possessed a weapon.

Indeed, the lack of reasonable suspicion that Mr. Hardin was armed is consistent with Officer Sala's conduct. Officer Salala did not approach the car with caution as if he suspected the driver or passenger possessed a firearm, nor did he pull out his firearm and order Mr. Hardin out of the car with his hands up, as officers normally would when they suspect an individual is armed and dangerous. Instead, Officer Salala approached the passenger side where Mr. Hardin was

United States District Court
Northern District of California

sitting, questioned Mr. Hardin and Ms. Addi for nearly three minutes, and used both his hands to hold a notebook and pen while asking questions and writing down information. *See* Salala BWC 0:48-3:36. He also took the cell phone from Mr. Hardin's hands and ordered him out of the vehicle without instructing him to raise or show his hands before grabbing him. Salala BWC 0:48–3:36; *see Rice*, 989 F.3d at 1123 (a reasonable jury could find the suspect did not present an immediate safety threat in part because the defendant officer turning her back on the plaintiff's car during the stop "undermin[ed] any suggestion that she believed [plaintiff] might have a firearm").

Although the reasonableness of the use of force under *Graham* is an objective test and is based on a reasonable officer standard, Officer's Salala's perception is relevant evidence of what an objectively reasonable officer would believe and understand, particularly since Defendants are not likely to take the position in this case that Officer Salala did not represent the actions of anything but a reasonable officer.[3] *Cf. Rice*, 989 F.3d at 1123.

Taking the evidence in the light most favorable to Mr. Hardin, a reasonable jury could find that it was not objectively reasonable for officers to believe Mr. Hardin posed an immediate threat to officer safety when the officers pulled him out of the car and brought him to the ground. Further, as noted above, the degree of threat to officer safety – or the lack thereof – is the most important factor under the *Graham* test. *Williams*, 112 F.4th at 643.

c. Degree of Resistance

The third *Graham* factor is the degree of resistance offered by the subject of the force. 490 U.S. at 396. A refusal to exit a vehicle and a failure to comply promptly with an officer's command, is not active resistance; it is passive. *Young*, 655 F.3d at 1165–66; *Nelson*, 685 F.3d at 881 (group of party-going individuals at an apartment complex who failed to immediately disperse "at most" engaged in passive resistance). Although Defendants contend that Mr. Hardin resisted Officer Salala's attempt to extract him from the vehicle by pulling his arm away, the nature of any such resistance is disputed. Salala Dep. at 66:7–22.

---

[3] A firearm was later found on Mr. Hardin's person, but it was discovered only after he was on the ground and handcuffed. The reasonableness of force is measured by what the officers knew at the time they acted, not on later acquired evidence. *Graham*, 490 U.S. at 396–97.

United States District Court
Northern District of California

Mr. Hardin does not contest in his deposition or in his briefing that he tried to pull his right arm away from Officer Salala's grasp. *See id.* The body camera footage shows Mr. Hardin attempting to remove his right wrist from Officer Salala's grasp by using Mr. Hardin's left hand to help pull his right wrist away. Salala BWC at 4:37–45; Charles BWC at 1:08–16. Viewing the video footage in Mr. Hardin's favor, a reasonable jury could find that Mr. Hardin did not *forcefully* attempt to resist, and that he only momentarily attempted to use his left hand to withdraw his right hand from the officer's grasp. A jury could reasonably find that Mr. Hardin's action was a reflexive response to Office Salala's sudden grasp of Mr. Hardin's hand and did not involve any real force. Mr. Hardin's minor resistance was totally ineffectual; within seconds, Officer Salala was able to grab both of Mr. Hardin's hands and quickly extract him from the vehicle. The video does not show Mr. Hardin striking Officer Salala or applying injurious force to Officer Salala's hand. Salala BWC at 4:37–45.

Thus, a reasonable jury could find that Mr. Hardin's verbal refusal to comply with a command and his reflexive reaction involving minimal, if any, force would constitute only passive or very minimally active resistance. *See, e.g., Thomas v. Dillard*, 818 F.3d 864, 890 (9th Cir. 2016) (stepping backwards away from the officer when the officer "tried to grab his arm," was "a brief reaction to [the officer's] own sudden movement" that constituted passive resistance); *Young*, 655 F.3d at 1165–66 (absent a warning he could be arrested for disobeying an officer, defendant who merely failed to comply with an officer's order did not actively resist arrest); *Close v. City of Vacaville*, 846 F. App'x 513, 516 (9th Cir. 2021) (tensing muscles and pulling hand awas was "at most minimal resistance" which did not justify application of non-trivial force).

Regarding the last *Graham* inquiry, the proportionality of the force employed: the force used against Mr. Hardin was "substantial" and "non-trivial." Forcibly extracting him from the vehicle, immediately taking him down face-first onto the pavement, and applying body weight on his back while handcuffing him is a "substantial" "non-trivial" use of force that cannot be justified by Mr. Hardin's passive or minimally resistive reaction. The Ninth Circuit has held that "non-trivial force was not justified in the face of *passive or even minimal resistance*." *Rice*, 989 F.3d at 1126 (*citing Nelson*, 685 F.3d at 881–82) (emphasis added); *Close,* 846 F. App'x at 516.

Defendants' authorities, particularly *Tatum v. City & Cnty. of S.F.*, 441 F.3d 1090 (9th Cir. 2006), and *Acosta v. City of Costa Mesa*, 718 F.3d 800 (9th Cir. 2013), are not persuasive. While those decisions held that an officer may use a control-hold takedown to overcome a suspect who actively resists being secured, the cases presuppose the very fact in dispute: active resistance. In *Tatum*, the suspect, who was believed to be intoxicated by a controlled substance after repeatedly kicking the side door of the Tenderloin police station, spun out of the officer's grasp and continued actively resisting. *Tatum*, 441 F.3d at 1095–96. In *Acosta*, the plaintiff was removed from a city council meeting for disrupting the meeting and refusing to leave the podium, and later resisted officers outside the city hall in an escalating situation with other protesters in attendance. 718 F.3d at 825. The plaintiff was found to have "actively resist[ed]" by "kicking and flailing his body[,]" causing another officer to fall to the ground. *Id.* at 809, 826. The force used by the officers in those decisions was reasonable *in response* to the active resistance they encountered, a fact disputably challenged here.

d. Summary

In sum, as to the first *Graham* factor, the severity of the offense was minimal – at most a seatbelt violation discovered upon a stop based on the driver's window tint violation. With respect to the second factor, a jury could find there was no reasonable basis to believe Mr. Hardin posed a threat to the safety of the officers. As to the third factor, as discussed above, a reasonable jury could find that Mr. Hardin presented only passive or minimal resistance when Officer Salala grabbed Mr. Hardin's wrist. The amount of force used to grab Mr. Hardin, take him to the ground, and hold him there while he was handcuffed was substantial and outweighed the justification for such force under the *Graham* factors. Summary judgment on the Phase One excessive force claim is therefore **DENIED**.

e. Qualified Immunity – Phase One

Defendants Salala and Charles alternatively assert qualified immunity as a defense to Mr. Hardin's excessive force claim.

Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate

the law." *Thomas*, 818 F.3d at 887 (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013)). An officer is entitled to qualified immunity unless (1) the facts, taken in the light most favorable to the plaintiff, establish a constitutional violation, and (2) the right was clearly established at the time of the conduct. *Pearson*, 555 U.S. at 232.

"[E]ven with a constitutional violation, officers may still receive qualified immunity if the unlawfulness of their conduct was not 'clearly established' at the time of arrest." *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1164 (9th Cir. 2022). A right is clearly established when existing precedent has placed the constitutional question "beyond debate," such that "every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011); *see also Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1038 (9th Cir. 2018). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela v. Hughes*, 584 U.S. 100, 105 (2018). This inquiry turns on the "objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244.

The inquiry is undertaken in light of the specific context of the case, *Kisela*, 584 U.S. at 104–05, though a case "directly on point" is not required, *White v. Pauly*, 580 U.S. 73, 79 (2017). "Where constitutional guidelines seem inapplicable or too remote, it does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness." *Kisela*, 584 U.S. at 105.

The plaintiff bears the burden of identifying a clearly established law. *See Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017). However, at summary judgment, the court resolves genuinely disputed facts in the plaintiff's favor at both steps of the inquiry, and then asks whether, on that version of the events, the law was clearly established. *Tolan v. Cotton*, 572 U.S. 650, 657, 660 (2014). Where the reasonableness of the force turns on disputed facts, qualified immunity cannot be granted at summary judgment. *Torres v. City of Madera*, 648 F.3d 1119, 1123–24 (9th Cir. 2011).

As noted above, viewing the evidence in Mr. Hardin's favor, Mr. Hardin was a passenger in a vehicle where the driver was suspected only of a minor equipment infraction. Mr. Hardin himself was, at most, in violation of the seatbelt law. He offered no real resistance other than refusing the command to get out of the car and reflexively trying to pull his hand away from the officer's grasp with minimal force. Nevertheless, the officers subjected Mr. Hardin to substantial, non-trivial force. Long before this incident, in 2013, the Ninth Circuit clearly established one's "right to be free from the application of non-trivial force for engaging in mere passive resistance." *Gravelet-Blondin*, 728 F.3d at 1093. And the Ninth Circuit held in 2012 (*Nelson*) and 2021 (*Rice*) that the application of non-trivial force is *not* justified in the face of passive or minimal resistance. *See Nelson*, 685 F.3d at 881; *Rice*, 989 F.3d at 1126.

In *Rice*, the officers stopped a vehicle for a minor signaling violation (failing to signal for a full five seconds). 989 F.3d at 1117. The driver showed the officer his license through the window but refused to provide his registration and proof of insurance, and refused to exit the vehicle. *Id.* The officer who initiated the stop called for "urgent" backup, stating she needed assistance getting the plaintiff out of the car. *Id.* The plaintiff rolled down the car window and unlocked the car, but continued to decline to exit the vehicle. *Id.* When the backup officer arrived, he and the officer who initiated the traffic stop pulled the plaintiff from the car, put him in a "police lead" position, and "forcibly threw him to the ground using a 'take-down' maneuver." *Id* The Ninth Circuit held that a reasonable jury could find that the plaintiff engaged in passive resistance, that the takedown was excessive, and that this would have violated clearly established law. *Id.* at 1125. The court held that the plaintiff's "refusals to exit his car [were] far closer to 'the purely passive protestor who simply refuses to stand' than to the 'minor' or even 'truly active' forms of resistance" the Ninth Circuit had considered in other cases. *Id.* at 1123 (citing *Bryan*, 630 F.3d at 830) (plaintiff's refusal to remain in his car after a traffic stop, even while "yelling gibberish and hitting his thighs," was not active resistance). The court reversed a grant of qualified immunity, holding that the right was clearly established years earlier. *Id.* at 1125–27.

Though not binding precedent, the Ninth Circuit's memorandum disposition in *Close v. City of Vacaville* is instructive. In *Close*, the plaintiff refused to leave a medical center exam room

United States District Court
Northern District of California

after repeated requests by a security guard. 846 F. App'x at 515. A police officer arrived and arrested the plaintiff for criminal trespass – a nonviolent misdemeanor. *Id.* at 516. The Ninth Circuit concluded that, under the *Graham* factors, a reasonable jury could find that the force used by the responding officer who fractured the plaintiff's arm was significant, while the justification for using such force was low because the plaintiff was being arrested for a nonviolent misdemeanor and posed only a minimal threat to the officer's safety. *Id.* at 515–16. The court also concluded that there were "genuine issues of disputed fact as to the amount and type of resistance [the plaintiff] employed." *Id.* at 516. Thus, there remained genuine issues of disputed fact as to whether the force used was unconstitutionally excessive. *Id.* at 515–16.

As for qualified immunity, the Ninth Circuit in *Close* observed that, prior to the plaintiff's 2016 arrest, it was clearly established that the use of "non-trivial force was unconstitutionally excessive when used against an individual who was passively resisting arrest." *Id.* at 516 (citing *Gravelet-Blondin*, 728 F.3d at 1092; *Nelson*, 685 F.3d at 881. "A reasonable jury could find that exerting enough force on [plaintiff's] arm to fracture it, partially dislocate her elbow, and tear the soft tissue, rose to the level of non-trivial force." *Id.* "[N]on-trivial force [is] not justified in the face of passive *or even minimal* resistance," the Ninth Circuit emphasized. *Id.* (quoting *Rice*, 989 F.3d at 1126). The officer alleged that the plaintiff resisted by "tensing her muscles" and "pulling her hand away." *Id.* But even if they were disputed, the Ninth Circuit concluded, the actions were "at most minimal resistance." *Id.* Thus, the court held, "[b]ecause clearly established law held that the alleged degree of force was excessive *whether [the plaintiff] was passively or minimally resisting*, and because there are genuine disputed issues of material fact on this case, the district court erred in granting summary judgment for [the police officer] on [plaintiff's] excessive force claim." *Id.* (emphasis added).

Based on the facts discussed above, viewed in Mr. Hardin's favor, the application of non-trivial force where all of the *Graham* factors favor the Plaintiff, violates clearly established law that "every reasonable official would have understood" prohibits the use of such force. *See Pearson*, 555 U.S. at 232; *Kisela*, 584 U.S. at 105; *Rice*, 989 F.3d at 1123; *Bryan*, 630 F.3d at 830;

United States District Court
Northern District of California

*Young*, 655 F.3d at 1165–66.[4]

Accordingly, qualified immunity on the Phase One excessive force claim is therefore **DENIED** as to both Officers Salala and Charles.

2. Phase Two: The Second Takedown

The second application of force occurred after Mr. Hardin had been handcuffed, searched, and disarmed, as Officer Salala walked him toward the patrol vehicle. Less than ten seconds after Mr. Hardin is picked up and walked towards the patrol vehicle by Officer Salala, Officer Salala pushed Mr. Hardin to the ground. Opp. 21; Salala Dep. at 90:21–91:4. The BWC footage does not clearly depict the events leading to Mr. Hardin falling to the ground, and the parties dispute the reason for the takedown. *See* Salala BWC at 5:17-26; Charles BWC at 1:53-56 (capturing the fall when Mr. Hardin was already in motion towards the ground).

The parties give differing accounts. Officer Salala claims that Mr. Hardin "attempted to pull away," so Officer Salala "redirected him to the ground." Opp. 21. Officer Salala testified that he did not have "good control" of Mr. Hardin's forearm, "Mr. Hardin leaned forward and spun in a circle to attempt to break free from [his] grasp," and that he "pushed him down using the same momentum to prevent him from running away, at which point he then fOpphit the ground." Salala Dep. at 90:21–91:4. Mr. Hardin testified that he moved his arm "one time because the cuffs [were] too tight," and that Officer Salala then "slammed" him on the shoulder and took him down to the ground. Hardin Dep. at 52:04–13. Because Officer Salala was walking side by side with Mr. Hardin (and because Officer Charles was turned away from Officer Salala and Mr. Hardin before the second takedown occurred), the BWC footage does not capture Mr. Hardin's arm movements and whether he spun in a circle or attempted to move away. Salala BWC at 5:17–26; Charles BWC at 1:50–56. Nor were any words exchanged between Mr. Hardin and Officer Salala.

---

[4] Mr. Hardin further argues that placing bodyweight on a "compliant detainee" violates clearly established law. *See* Opp at 15; *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) (it was clearly established that pressing weight on plaintiff's neck and torso when plaintiff's hands were cuffed behind his back, he offered no resistance, and cried for air). The Court need not reach the question whether any use of officer bodyweight in the fashion alleged violates clearly established law per se.

Salala BWC at 5:17-26.

By this point, the governmental interest had diminished even further relative to Phase One: Mr. Hardin was handcuffed and searched, and the firearm had already been recovered. Mr. Hardin's capacity to harm the officers or others was controlled. The gun, now part of the totality of the circumstances known to the officers by the time Phase Two began, was not a source of immediate threat, as Mr. Hardin had been disarmed and restrained.

The only justification for the second takedown was Officer Salala's assertion that Mr. Hardin was attempting to flee. Mr. Hardin responds that he shifted his arm because his handcuffs were too tight, not because he was attempting to flee, and that as a cuffed and disarmed teenager surrounded by officers in the middle of a street, he posed no flight or safety risk. Opp. at 15–16. As set out above, the BWC footage does not resolve whether Mr. Hardin intended to flee in the moments before the second takedown. *See* Salala BWC at 5:17–22; Charles BWC at 1:49–53.

Taking the evidence in the light most favorable to Mr. Hardin – a handcuffed, disarmed suspect who shifted his position but made no obvious attempt to flee – a reasonable jury could find that there was no legitimate need for the second takedown and that the force used was therefore unreasonable. "Gratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment," *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001), and "since there [i]s no need for force," such force is "objectively unreasonable," *P.B. v. Koch*, 96 F.3d 1298, 1303–04 & n.4 (9th Cir. 1996). Moreover, all the *Graham* factors at this juncture favor Mr. Hardin. Viewed in his favor, the facts establish that Mr. Hardin was not actively committing a crime, there was no immediate threat to officer safety, and there was no resistance. The fact that Mr. Hardin's legs were unrestrained and that he theoretically could have run does not establish an undisputed risk of or attempt at flight – especially because Mr. Hardin's arms were cuffed and he was surrounded by police officers who had arrived at the scene. A reasonable jury could find the second takedown – the use of non-trivial, potentially injurious force – was an unreasonable use of force under *Graham*.

Summary judgment on the Phase Two excessive force claim is therefore **DENIED** as to Officer Salala.

United States District Court
Northern District of California

a. Qualified Immunity – Phase Two

Applying the framework set out above, qualified immunity does not shield Officer Salala on this record.

Taking the facts in Mr. Hardin's favor, it was clearly established well before February 2024 that an officer may not use non-trivial force against a handcuffed, disarmed suspect who is not resisting or attempting to flee. *Blankenhorn v. City of Orange*, 485 F.3d 463, 480–81 (9th Cir. 2007) (because "force is only justified when there is a need for force," a reasonable officer would be on notice that "punching [plaintiff] to free his arms when, in fact, he was not manipulating his arms in an attempt to avoid being handcuffed, was also a Fourth Amendment violation"); *LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) (a reasonable officer would have known that pepper spraying a plaintiff who has surrendered and is "rendered helpless" by handcuffs constituted excessive force).

On Mr. Hardin's version of events, Officer Salala pushed a cuffed, disarmed, non-fleeing suspect to the ground, risking injury, in violation of the clearly established law barring the use of non-trivial force absent any reasonable justification under *Graham*. Qualified immunity is therefore **DENIED** as to Officer Salala on the Phase Two excessive force claim.

B. Unlawful Arrest and Detention (Officers Salala, Charles, and Castillo)

Mr. Hardin's second claim alleges that the officers detained and arrested him in violation of the Fourth Amendment. Mr. Hardin has narrowed this claim considerably in his opposition brief. He does not appear to dispute, for purposes of the motion, that the traffic stop was lawfully initiated based on the window tint. Opp. at 12. Mr. Hardin concedes that once the officers discovered the firearm, they had probable cause to arrest him. *Id.* at 16. He has also withdrawn all individual-capacity claims against Officer Remick. *Id.* at 17.

What remains is a much narrower contention: that Officer Salala unlawfully prolonged the stop by investigating Mr. Hardin, demanding his identification, and seizing his phone, without independent reasonable suspicion and *before* the firearm was found. Opp. at 12. For the reasons set forth below, the Court **GRANTS** in part and **DENIES** in part summary judgment on this claim.

A traffic stop is a seizure that must be justified at its inception and limited in scope to its "mission" – addressing the violation that warranted the stop and attending to related safety concerns. *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015) (dog sniff conducted around the plaintiff's vehicle stopped for driving in a shoulder lane exceeded the "mission" of issuing a ticket for the violation). An officer may pursue unrelated inquiries during a stop, but may not do so in a manner that prolongs the stop beyond the time reasonably required to complete that mission, absent independent reasonable suspicion. *Id.* at 355, 357. Relatedly, an officer may order a driver or passenger out of a lawfully stopped vehicle. *Mimms*, 434 U.S. at 111 (when weighed against concerns for officer safety, the additional intrusion on a driver's personal liberty is *de minimis*); *Wilson*, 519 U.S. at 414–15 (applying the *Mimms* rule to passengers).

The rationale for extending the order to the passenger is to protect officer safety, and thus no particularized justification is required. However, demanding a passenger's identification is permissible only if it is part of the mission of a traffic stop, or (2) there is reasonable suspicion that the passenger has committed a criminal offense. *United States v. Landeros*, 913 F.3d 862, 867–68 (9th Cir. 2019).

*Landeros* governs the inquiry as to whether an officer may not only request a passenger to exit the vehicle, but also request the passenger's identification. *Landeros* involved an early morning vehicle stop where the driver, Mr. Landeros, was pulled over for driving 11 miles over the speed limit near a Pascua Yaqui Indian reservation. 913 F.3d 864. The officer saw two individuals who appeared to be minors sitting in the backseat and noticed the smell of alcohol in the car. *Id.* He asked the passengers for identification because they looked under the age of eighteen and it was past the 10:00 p.m. tribal code curfew for minors. *Id.* The passengers – aged 19 and 21 – provided their identification. *Id.*

The Ninth Circuit concluded that the officer was permitted to "prolong the initially lawful stop to ask the two women for identification, because he had reasonable suspicion they were underage." *Id.* This reasonable suspicion was independent of the reasonable suspicion that supported the traffic stop for speeding. *See id.* The Ninth Circuit reasoned that ordinarily, the identity of a passenger has "no relation to a driver's safe operation of a vehicle." *Landeros*, 913

F.3d at 868. The mission of the traffic stop involves "ordinary inquiries incident to the traffic stop" such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (quoting *Rodriguez*, 575 U.S. 348 at 355). Those inquiries each share "the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* (quoting *Rodriguez*, 575 U.S. 348 at 355).

Thus, per *Landeros*, while an officer may order a passenger out of the car during a traffic stop, the officer may not prolong the stop by demanding the passenger's identification absent reasonable suspicion of the passenger's criminal conduct. *Id.*

For the reasons stated below, each component of this stop was lawful and not unreasonably prolonged. However, the seizure of the phone was unlawful.

1. Order to Exit the Vehicle

First, the Court addresses Officer Salala's order that Mr. Hardin exit the vehicle. This command was lawful. Under *Mimms* and *Wilson*, Officer Salala could order Mr. Hardin, a passenger in a lawfully stopped car, to step out. *Mimms*, 434 U.S. at 111; *Wilson*, 519 U.S. at 414–15. No particular suspicion of danger is required. Applicable case law disposes of any claim premised on the order to exit itself. Since ordering the passenger to exit is generally permissible, the time it takes to effectuate that order cannot be deemed an unlawful prolonging of the stop.

2. Demand for Identification

Second, the Court addresses the demand for identification. This request did not exceed the permissible scope of the stop, because Officer Salala had an independent justification to investigate Mr. Hardin. Officer Salala testified (and the BWC footage establishes) that Mr. Hardin was not wearing a seatbelt – a violation of state law. Salala Dep. at 10:24–12:6; MSJ Reply at 5 (arguing that Mr. Hardin's failure to wear a seatbelt "provided Officer Salala with reasonable suspicion to investigate Plaintiff for a criminal violation/infraction and to demand his identification"). Having personally observed Mr. Hardin committing that violation, Officer Salala was entitled to ascertain Mr. Hardin's identity to issue a citation. *See Landeros*, 913 F.3d at 868. The seatbelt infraction thus supplied the independent reasonable suspicion basis to request

identification from Mr. Hardin as a passenger. And again, the time spent trying to obtain Mr. Hardin's identification did not unlawfully prolong the stop under these circumstances.

3. Seizure of the Phone

Third, the Court addresses the seizure of Mr. Hardin's cell phone. Officer Salala testified that he feared that Mr. Hardin used his phone to summon others to the scene located in a "high-crime area," and that Officer Salala took the phone as a safety precaution. Salala Dep. at 47:2–49:4. Mr. Hardin, however, testified that he simply called his sister who lived down the street so that he would have a witness present if anything were to happen to him. Hardin Dep. at 35:17-36:18.

During a traffic stop seizure, officers may take reasonable measures to address safety concerns attendant to the traffic stop. *See Rodriguez*, 575 U.S. at 356 (an "officer may need to take certain negligibly burdensome precautions in order to complete [their] mission safely"); *United States v. Hylton*, 30 F.4th 842, 847 (9th Cir. 2022) (a criminal history check is a negligibly burdensome precaution necessary to complete a stop safely). Defendants, however, do not identify any case law establishing that there was a reasonable basis to conclude that an individual contacting other individuals during a traffic stop – here, a family member – interfered with Defendants' ability to conduct the traffic stop or threatened officer safety. *Cf. Yun v. City of Los Angeles*, No. CV 16-05468-SVW-KS, 2016 WL 11969686, at *3 (C.D. Cal. Dec. 28, 2016) (rejecting general assertions that "officer safety grant[s] an officer carte blanche to physically strip a subject's cell phone through any means necessary" when officers admit that "Plaintiff's cell phone use did not interfere in their ability to complete the stop."). At the very least, viewing the facts and reasonable inferences in Mr. Hardin's favor, a reasonable jury could find there was no sufficient basis for believing Mr. Hardin's call was intended to summon others to come and interfere with the officers' activity in conducting the stop. There is no evidence, for instance, that the police knew or suspected that Mr. Hardin was involved in gang activity and that he was likely summoning other gang members to come to the scene and intervene. Thus, absent a reasonable safety justification, Officer Salala's seizure of Mr. Hardin's phone violated his Fourth Amendment rights. This is so regardless of whether that seizure actually prolonged the stop.

United States District Court
Northern District of California

4. The Arrest

Fourth, the Court addresses the arrest itself. Mr. Hardin concedes that the arrest following discovery of the firearm was supported by probable cause. Opp. at 16 ("Once the weapon was found, probable cause existed on the firearms offenses regardless of the lawfulness of what preceded it."). Once the officers found a loaded gun concealed in Mr. Hardin's waistband, they had probable cause to arrest him for its possession. This concession defeats any false-arrest theory, because probable cause to believe a person has committed an offense forecloses such a claim. *Hart v. Parks*, 450 F.3d 1059, 1069 (9th Cir. 2006) ("Because police had probable cause to arrest him, Hart's false arrest claim necessarily fails.") (citing *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) (per curiam)).

Because the stop, order to exit, demand for identification, and the arrest were all lawful, Mr. Hardin's unlawful arrest and detention claim fails as a matter of law as to those aspects of the stop. This is a matter independent of the use of force in enforcing the officer's lawful command to Mr. Hardin to exit the car. However, viewing the facts in Mr. Hardin's favor, a jury could find that Officer Salala's seizure of Mr. Hardin's cell phone, absent any officer-safety justification, violates the Fourth Amendment.

Summary judgment on the unlawful arrest and detention claim as to Officers Salala and Charles is therefore **GRANTED IN PART** and **DENIED IN PART**, solely as to the cell phone seizure.

a. Qualified Immunity

Qualified immunity as to the cell phone seizure is **DENIED** as to Officer Salala.

Mr. Hardin bears the burden of identifying a clearly established law. *Shafer*, 868 F.3d 1110, 1118 (9th Cir. 2017). As stated above, a traffic stop seizure may extend beyond the "mission of the stop itself" if the precautions are required to complete the mission safely. *Rodriguez*, 575 U.S. at 356. For example, criminal record and warrant checks during a traffic stop are justified as a matter of officer safety. *Id.* (citing *United States v. Holt*, 264 F.3d 1215, 1223 (10th Cir. 2001)). That an officer may take reasonable measures to protect officer safety during the traffic stop is established. *See id.*

Here, the contours were sufficiently definite that an officer would have known they were violating these standards. *Kisela*, 584 U.S. at 105. *Rodriguez* and *Taylor* establish that the "mission of the stop itself" may only be expanded if the precautions are required to complete the mission safely. *Rodriguez*, 575 U.S. at 356; *United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023) (asking the suspect whether he had been arrested before or had drugs or weapons in his car were "basic questions" reasonably asked in the name of officer safety). Here, a jury could find that no objectively reasonable safety concern justified the seizure of Mr. Hardin's phone. Absent any safety justification, no reasonable officer could find that seizing a cell phone was required to complete the mission safely.

Officer Salala claims that he doesn't recall whether he "actually observe[d] the texts that Mr. Hardin was sending," and claimed it was "a common tactic that people use to overwhelm law enforcement when they don't want to be pulled over." Salala Dep. at 35:25, 26:1–10. Calling "people" generally, without any indication that those people were being summoned to the scene or would pose a threat to officers, does not objectively indicate a safety threat. As discussed above, absent any other indication based on the alleged offense (a seatbelt violation) that Mr. Hardin was involved in organized crime or had connections to dangerous individuals who may arrive on scene (*i.e.* verbal statements summoning assistance or asking others to confront police), no reasonable officer could have concluded that Mr. Hardin's use of a cell phone threatened officer safety. *See Rodriguez*, 575 U.S. at 356; *Pearson*, 555 U.S. at 244 (objective legal reasonableness is assessed in light of legal rules clearly established at the time the action was taken). *Cf. Yun v. City of Los Angeles*, No. CV 16-05468-SVW-KS, 2016 WL 11969686, at *9 (C.D. Cal. Dec. 28, 2016) ("[N]o reasonable officer under these circumstances, with Plaintiff as the subject, could have reasonably found that her use of a cell phone—after complying with officer orders to produce her license, registration, and insurance, and without making any verbal threats towards the officers or physically assaulting them in any way, and without any officer believing that she possessed a weapon or was otherwise dangerous or would flee the scene—could constitute an officer safety issue. *To hold as such would allow all officers to forcibly remove the cell phone from every individual they stop for a traffic violation regardless of the specific facts involved*. In this case, any

reasonable officer would have understood that his or her actions violated Plaintiff's clearly established constitutional rights.") (emphasis added).

Thus, qualified immunity is **DENIED** as to Officer Salala's seizure of Mr. Hardin's phone.

C. Failure to Intervene and Integral Participation (Officers Castillo and Remick)

Mr. Hardin alleges in his first amended complaint that Officers Castillo and Remick are liable for failing to intervene in Officers Salala and Charles' conduct in removing Mr. Hardin from the car, taking him down, and handcuffing him on the ground. Since filing the FAC, Mr. Hardin voluntarily dismissed Officer Remick from all individual-capacity claims. Opp. at 17. Mr. Hardin has also abandoned the failure-to-intervene theory as to Officer Castillo, recasting the remaining claim against Castillo as one for integral participation in the allegedly unlawful detention. *Id.* ("Officer Castillo stands differently [than Officer Remick], and Plaintiff is precise about the theory. It is not failure to intervene in the force. It is integral participation in the unlawfully prolonged detention.").

The Court **GRANTS** summary judgment as to Mr. Hardin's claims against Officer Remick, and his failure to intervene claim as to Officer Castillo.

To the extent Mr. Hardin claims Officer Castillo's "integral participation," now argued but not formally pled in his first amended complaint, that argument lacks merit. FAC ¶¶ 158–76 (Count 4). "Integral participation" requires an individual assessment of Castillo's participation beyond his presence at the scene. *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004). While "'integral participation' does not require that each officer's actions themselves rise to the level of a constitutional violation[,]" "mere bystanders" with "no role in the unlawful conduct" are also not liable. *Id.* (quoting *Chuman v. Wright*, 76 F.3d 292, 294-95 (9th Cir.1996)). Active participation or facilitation of the conduct beyond mere presence is required. In *Nicholson*, the Ninth Circuit held that the officer who gave the order to handcuff teenage boys played an integral role in the subsequent prolonged detention and sustained handcuffing of the plaintiffs. *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692 (9th Cir. 2019). In *Boyd*, the court concluded that all SWAT officers involved in a post-robbery search operation were integral participants where only one officer threw a flash-bang "blind" into a dark apartment that burned a woman who was sleeping in

the apartment. *Boyd*, 374 F.3d at 77980. There, because all officers on the SWAT team knew of the plan to use the flash-bang and did not object, they actively participated in its operation. *Id.* at 780.

Castillo did not participate in the detention and use of force. He was not involved in the initial stop or the questioning of the occupants of the vehicle during the initial stop. Nor did Officer Castillo participate in Officer Salala's removal of the cell phone from Mr. Hardin's hand. The BWC footage depicts Officer Salala taking Mr. Hardin's phone from him between 3:46:09 p.m. and 3:46:11 p.m. Salala BWC at 2:17. Officer Castillo's BWC video depicts him arriving to the scene and turning on his body-worn camera at 3:47:56 p.m. – nearly two minutes after Officer Salala took the phone from Mr. Hardin.

When Officer Salala pulled Mr. Hardin from the car at 3:48:30 p.m., and Officer Charles assisted Officer Salala in taking Mr. Hardin down to the ground at 3:48:34 p.m., Officer Castillo was standing by the driver's side door, having just arrived on scene about 20 seconds earlier. Castillo BWC at 0:29–36. The only warning Officer Castillo had before Officer Salala pulled Mr. Hardin from the car was the driver, Addi, stating loudly, "you can't grab him like that" – four seconds before Officer Salala pulled Mr. Hardin from the car. *Id.* at 0:33–36. On this record, there is no basis to find Officer Castillo participated in the use of force against Mr. Hardin.

While Officers Salala and Charles were handcuffing and searching Mr. Hardin on the ground, Officer Castillo grabbed Addi by the arm while she was recording the officers. Castillo BWC at 0:36–54. He then removed Addi from the vehicle, removed her phone, and handcuffed her. *Id.* at 1:28. But any use of force in relation to Addi is not the subject of this case. Furthermore, at the time of the second takedown of Mr. Hardin, Officer Castillo was handcuffing Addi by the vehicle. *Id.* at 1:20. Mr. Hardin claims that Castillo knew of and acquiesced to the plan because he assisted in the "companion seizure" of Addi. Opp. at 18.

This argument is unavailing. Unlike the pre-search knowledge of conduct that conferred liability for the flash-bang deployment in *Boyd*, Officer Castillo arrived at the scene minutes into the stop, and did not consult at any time with Officers Salala and Charles prior to the takedown and handcuffing. *Boyd*, 374 F.3d at 779–80. Mr. Hardin's argument that there was a concerted

plan – a "single coordinate seizure" – to remove both participants from the vehicle is unsupported by any record evidence and appears purely speculative. There was no pre-action agreement or verbal indication that all officers would collectively engage in any specific operation with respect to Mr. Hardin's takedown and handcuffing, and Officer Castillo stood on the other side of the car as the other officers initiated the search and handcuff of Mr. Hardin. Unlike the officer in *Nicholson,* Officer Castillo did not engage in any decision making as to the takedown and ground restraint of Mr. Hardin – nor did he go over to the other side of the vehicle to assist the other officers in any way. 935 F.3d at 692.

Last, the Ninth Circuit has also previously concluded that an officer who "provided crowd control" did not participate in "any integral way" to the arrest. *Blankenhorn*, 485 F.3d at 481 n.12. To the extent Mr. Hardin considers removal of Addi from the vehicle as analogous to crowd control or preventing bystanders from assisting Mr. Hardin, that argument lacks merit.

Summary judgment is therefore **GRANTED** as to Officers Castillo and Remick on Count Four.

D. *Monell* Liability (City of Richmond)

Mr. Hardin's third claim seeks to hold the City of Richmond liable under Section 1983. A municipality is not liable under Section 1983 on a theory of *respondeat superior*; it may be held liable only where the execution of its own policy or custom inflicts the constitutional injury. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691–94 (1978). A plaintiff must identify a municipal policy or custom and establish "a direct causal link" between it and the constitutional deprivation – *i.e.*, that the policy or custom was the "moving force" behind the violation. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Because the Court has held that a jury could find the officers used excessive force in Phases One and Two, an underlying constitutional violation remains live in this case. The Court thus proceeds to the merits of Mr. Hardin's three theories of municipal liability: custom, ratification, and failure to train. Even if a jury were to find the officers' use of force excessive, summary judgment is **GRANTED** for the City on each theory.

1. Custom

A plaintiff may establish municipal liability by proving a longstanding practice or custom that constitutes the standard operating procedure of the public entity. A custom is not shown by isolated or sporadic incidents; it requires "practices of sufficient duration, frequency, and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). "A single constitutional deprivation ordinarily is insufficient." *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

Mr. Hardin's evidence of custom – internal-affairs files reflecting exonerated uses of force during stops and civil actions filed against the City before this incident – does not meet that standard. These materials are offered to show notice of a practice of unlawful use of excessive force by Richmond police officers, but notice of civilian complaints about use of force is not sufficient evidence that there was a custom or practice of constitutional violations. The internal-affairs files reflect that the City investigated and did not sustain any claims of unlawful use of force, and the civil actions filed in court were unproven allegations. Mr. Hardin does not cite any verdicts finding excessive force, and certainly not a sufficient number to show a custom or practice. Moreover, Mr. Hardin supplies no context, such as the number of stops, arrests, or uses of force against which the identified incidents may be measured, and from which a jury could find frequency and consistency of such incidents. In addition, the incidents appear factually disparate; the one sustained finding of excessive force against Officer Salala arose from a separate, later, and dissimilar matter. On the record herein, Mr. Hardin has not established that unconstitutional use of excessive force was "the traditional method of carrying out policy." *Trevino*, 99 F.3d at 918. Mr. Hardin thus cannot demonstrate a municipal custom supplied the moving force behind his injury. Summary judgment is therefore **GRANTED** on Mr. Hardin's custom theory.

2. Ratification

A municipality may be liable where "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992). To show ratification, a plaintiff must prove that the "authorized policymakers approve a subordinate's decision and the basis for it," with knowledge of the

constitutional violation, and that they "actually approve[d] of it." *Christie*, 176 F.3d at 1239 (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)); *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). Critically, "[a] mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim." *Christie*, 176 F.3d at 1239.

Mr. Hardin's ratification theory rests on the City's investigation of this incident and its decision not to sustain a finding of misconduct against Officers Salala and Charles. That is precisely the "mere failure to overrule" that *Christie* holds insufficient. A decision not to discipline, standing alone, does not establish that a final policymaker knew of and affirmatively approved the officers' conduct. Mr. Hardin identifies no policymaker who reviewed the use of force and endorsed it as consistent with the Fourth Amendment, as distinct from declining to sustain a complaint. The City's post-incident "exoneration" of Officer Salala does not indicate that the City was the "moving force" behind the injury – particularly one that occurred before the City allegedly "approved" of the offending conduct. *Brown*, 520 U.S. at 404 ("The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."). And the City's later termination of Officer Salala for excessive force in a separate matter is inconsistent with the inference of supervisory approval. Mr. Hardin cannot demonstrate ratification, and summary judgment is **GRANTED** on this theory.

3. Failure to Train

A municipality may be liable for failure to train "[o]nly where [that] failure . . . reflects a 'deliberate indifference' to the rights of its inhabitants." *Canton*, 489 U.S. at 389. Deliberate indifference exists where "the need for more or different training is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. Ordinarily, "[a] pattern of similar constitutional violations by untrained employees is necessary," and a single incident will rarely suffice. *Connick v. Thompson*, 563 U.S. 51, 62 (2011). Single-incident liability, where a pattern of violations may not be necessary to show "deliberate indifference," may arise where "the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of

United States District Court
Northern District of California

violations." *Id.* at 63-64. And as with any theory of municipal liability, the training inadequacy must cause the injury. *Canton*, 489 U.S. at 385, 391.

Mr. Hardin's failure to train theory does not meet the standard. Opp. at 27-28. The record does not show an absence of training on the relevant subjects. To the contrary, the City's own Rule 30(b)(6) designee testified that Richmond trains its officers on the very practice that Mr. Hardin invokes — to limit body weight on a prone subject and to roll a subject onto their side. Mr. Hardin identifies no specific deficiency in the City's training on traffic stops or treatment of passengers, and offers no evidence that any such deficiency was so obvious that the City's policymakers were deliberately indifferent to the likelihood of law violations likely to result in the absence of training. *See Canton*, 489 U.S. at 389. Mr. Hardin fails to point to a likelihood of severe injury that might support the rare case of single-incident liability for failure to train. See *Connick*, 563 U.S. 63–64. And Mr. Hardin has not shown that any training deficiency caused his injury. *See Canton*, 489 U.S. at 385, 391.

In sum, Mr. Hardin cannot demonstrate that a failure to train amounted to a policy or custom, that it reflected deliberate indifference, or that it was the moving force behind the constitutional deprivation. Accordingly, summary judgment is **GRANTED** on the failure to train theory.

4. <u>Rule 56(d)</u>

In the alternative, Mr. Hardin asks the Court to defer a ruling on the *Monell* claim under Rule 56(d) to permit additional discovery into the City's policies and training. A party seeking such relief must identify the specific facts it hopes to obtain, show that those facts exist, and show that they are essential to opposing summary judgment. *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 678 (9th Cir. 2018). Mr. Hardin has not identified with any degree of specificity what further discovery might provide. The request for relief under Rule 56(d) is therefore **DENIED**.

* * *

Because Mr. Hardin cannot establish municipal liability under any of his theories, summary judgment is **GRANTED** in favor of the City of Richmond on the *Monell* claim.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**, as follows:

On the excessive force claim, the motion for summary judgment is **DENIED** as all uses of force. Thus, summary judgment on excessive force is **DENIED** as to Officer Salala (Phase One and Phase Two) and Officer Charles (Phase One ).

Summary judgment as to qualified immunity is **DENIED** as to Officers Salala and Charles for both phases of force.

On the unlawful arrest and detention claim, the motion for summary judgment is **DENIED** as to Officer Salala's seizure of Mr. Hardin's phone, but **GRANTED** as to the alleged detention delays. Qualified immunity, however, is **DENIED** as to Officer Salala's seizure of the phone. Summary judgment as to unlawful arrest and detention is otherwise **GRANTED** as to all other Defendants.

On the failure to intervene claim, the motion for summary judgment is **GRANTED** as to Officers Castillo and Remick; and

On the *Monell* claim, the motion for summary judgment is **GRANTED** in favor of the City of Richmond.

**IT IS SO ORDERED**.

Dated: October 7, 2026

EDWARD M. CHEN
United States District Judge